IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MICHAEL CRAIG, ) | Case No. 1:16-cv-1003 |
| ) | |
| Petitioner, ) | JUDGE SARA LIOI |
| ) | |
| v. ) | MAGISTRATE JUDGE |
| ) | THOMAS M. PARKER |
| WARDEN JOHN COLEMAN, ) | |
| ) | |
| Respondent. ) | **REPORT AND RECOMMENDATION** |
| ) | |

## I.     Introduction

Michael Craig was convicted of multiple counts of aggravated robbery, aggravated burglary, felonious assault, kidnapping and having weapons under disability in 2009. He now seeks a writ of habeas corpus from this court. There is no question that Craig's habeas corpus petition is untimely. Warden Coleman has asked us to dismiss the petition as a result. Craig attempts to salvage his petition by arguing that his actual innocence serves to equitably toll the statute of limitations. He proffers affidavits from five family members who attest that he was living in New York during a several month period that includes the date the crimes were committed. Because these affidavits are not exculpatory, new, or reliable, Craig has not demonstrated actual innocence sufficient to trigger a merits review of his petition.

I recommend that Respondent's motion to dismiss be **GRANTED**.

## II.      Factual Background

The Ohio Court of Appeals recited the facts of this case.  These factual findings are presumed to be correct unless Craig rebuts the presumption by clear and convincing evidence." 28 U.S.C. §2254(e)(1); *Warren v. Smith,* 161 F.3d 358, 360-61 (6th Cir. 1998):

> In 2008,[1] Teresa Dickerson ("Dickerson") was sleeping in her home. Also present were Dickerson's four children and her daughter's live-in boyfriend, Luis Perez ("Perez"). Dickerson testified she awoke around five in the morning when two men broke into her apartment. One man pointed a gun at her and asked, "where is the fat white boy?" The gunman left the bedroom and told the other man to stay and watch her. That man eventually left and Dickerson was able to escape from the apartment. She ran to the end of her driveway and called 911 on her cell phone.
>
> At some point, Dickerson saw two men run out of the apartment and get into a car with a loud exhaust. She testified that she recognized the loud exhaust as belonging to a car that frequented the neighborhood.
>
> Perez, who was in bed with Dickerson's daughter, Kimberly, testified that he awoke when two men kicked in the locked bedroom door. Perez immediately recognized the man holding a gun as Craig, who Perez knew by the names "Will" and "New York." Perez testified that he knew Craig because Craig played basketball with the neighbors that lived downstairs.
>
> Craig asked Perez where he hid his money and then struck Perez in the head with a gun. The other intruder began to rifle through the couple's belongings and tried to take a video game system, but dropped it when he could not get it unplugged. The men left to go downstairs, and Perez soon heard Kimberly's brother Joshua start to yell.
>
> Joshua testified that he awoke to a man sticking a gun in his face, demanding money. The man took $20. Joshua testified that he was certain it was Craig based on his voice and that he had met Craig before. Dickerson's other son, Raymond, testified he was sleeping on the couch when two men woke him by flipping him off the couch. Raymond tried to defend himself, and the intruders wrestled him back onto the couch and hit him with a gun. They then ordered him to lie on the floor while they went through his wallet.
>
> Perez and Raymond were taken by ambulance to the hospital. Perez received six stitches to his face for his injuries, and Raymond received three staples for the gash to his head. The Dickerson family and Perez were all able to identify Craig as someone from the neighborhood and chose him out of a police-made photographic line-up. They

---

[1] The date of the offense as alleged in the indictment was August 6, 2008.  ECF Doc. No. 7-1, Page ID# 85.

>  also identified him in court, although Joshua insisted he saw three intruders on the night of the robbery.
>
>  The jury convicted Craig of all the charges except for one count of aggravated robbery. The trial court convicted him of the having a weapon while under disability charge and sentenced him to a total of 33 years in prison.

ECF Doc. No. 7-1, Page ID# 208-10.

### III.   Relevant State Procedural History

#### A.   State Trial

Craig was indicted by a Cuyahoga County grand jury on a seventeen-count indictment alleging two counts of aggravated burglary, five counts of aggravated robbery, four counts of felonious assault, five counts of kidnapping (all with firearm specifications) and one count of having weapons under a disability. ECF Doc. No. 7-1, Page ID# 85-102. Craig pleaded not guilty. Id. at 103. Craig filed a timely notice of alibi (i.e., that he was with his grandmother in New York at the time of the commission of the crime). Id. at 104. The weapon under disability count (Count 17) was tried to the court, and a jury considered the remaining counts. Id. at 105-06. On October 27, 2009, Craig was found guilty as charged on all counts, except on the Count 10 aggravated robbery charge. Id.

After merging Craig's convictions for kidnapping into his convictions for aggravated robbery, and merging the gun specifications, the court sentenced Craig to an aggregate term of 33 years imprisonment. Id. at 107.

#### B.   Direct Appeal

Craig filed a timely notice of appeal asserting 15 assignments of error. ECF Doc. No. 7-1, Page ID# 128-29. The Ohio Court of Appeals overruled the majority of Craig's claims, but sustained his twelfth and fourteenth assignments of error, in part. The case was remanded with

instructions to merge the convictions in Count 1 with 2, Count 3 with 4, and Count 5 with 6, because the appellate court found that they were allied offenses of similar import. Id. at 228-30. The court concluded that "although the aggregate sentence should remain the same, by law, the convictions should be merged." Id. at 229 (citation omitted).

Craig attempted an appeal to the Ohio Supreme Court. Id. at 252-950. But on May 25, 2011 the Court declined to exercise jurisdiction. Id. at 297.

### 1. Resentencing

Pursuant to the appellate court's remand, the trial court conducted a new sentencing hearing on March 11, 2011. Id. at 298. After merging the convictions in Counts 1 and 2, Counts 3 and 4, and Counts 5 and 6, the trial court again sentenced Craig to 33 years. Id.

Three months later, Craig filed a Motion to Vacate Sentence[2] (Id. at 300-01), which was denied a few days later (Id. at 303).

### 2. Motion for Delayed Appeal

Craig next filed a Motion for Delayed Appeal on July 20, 2011. Id. at 309-310. Craig was permitted to file a delayed appeal, but the appellate court ultimately overruled all three of Craig's assignments of error. Id. at 330-339. Craig filed an Application for Reconsideration, which was denied by the appellate court. Id. at 347.

Next, Craig filed a notice of appeal to the Ohio Supreme Court. Id. at 348-370. However, on October 10, 2012, the Ohio Supreme Court declined to exercise jurisdiction. Id. at 372. Craig did not file a petition for writ of certiorari in the United States Supreme Court, and

---

[2] In his Motion to Vacate Sentence, Craig argued that the trial court was without jurisdiction to resentence him on March 11, 2011, because his appeal to the Ohio Supreme Court was not dismissed until two months after his resentencing. However, the trial court denied the Motion to Vacate Sentence finding that Craig's counsel waived that argument by failing to object on that ground at the time of resentencing. ECF Doc. No. 7-1, Page ID# 303.

his conviction became final on January 8, 2013, 90 days after the Ohio Supreme Court declined to hear the case.

### C. Post-Conviction Relief

Five months after Craig's resentencing he filed a Motion for Leave to File a Motion for New Trial and/or a Petition for Postconviction Relief. Id. at 373-82. Craig argued that he was "actually innocent" based on "new evidence" that consisted of five affidavits from family members attesting that Craig was in New York from approximately July through November 2008 (the affidavits were from his mother, grandfather, a cousin, an uncle and an aunt). Id. On September 30, 2011, the trial court denied Craig's motion as untimely and further stated as follows:

> …AND IN REVIEWING THE EXPECTED NATURE OF THE "NEW" EVIDENCE AS SET FORTH IN THE DEFENDANT'S BRIEF, THE COURT IS UTTERLY UNIMPRESSED. IT STRAINS CREDIBILITY TO THE BREAKING POINT TO BELIEVE THAT THE DEFENDANT IN THIS CASE WAS UNAVOIDABLY PREVENTED, AS REQUIRED BY [OHIO CRIM. R. 33(B)], FROM DISCOVERING THAT HE WAS NOT ONLY NOT PRESENT AT THE SCENE OF THE CRIME, BUT WAS NOT EVEN IN THE STATE OF OHIO, ON THE DATE THAT THE CRIMINAL ACTS FOR WHICH HE WAS FOUND GUILTY WERE COMMITTED. FURTHER THE RECORD ITSELF REFLECTS THAT TESTIMONY WAS PRESENTED TO THE TRIERS OF FACT THAT THE DEFENDANT WAS NOT PRESENT AT THE TIME. THE COURT IS SIMILARLY UNIMPRESSED WITH THE SELF-SERVING, FORMULAIC AFFIDAVITS SUBMITTED UNDER PENALTY OF PERJURY BY THE DEFENDANT'S OWN FAMILY MEMBERS.

Id. at 392.

On October 28, 2011, Craig filed a notice of appeal from the trial court's decision. Id. at 394-404. On April 19, 2012, the appellate court overruled Craig's appeal finding that the "newly discovered" evidence was either known to him at the time of trial or could have been found, and was merely cumulative to evidence presented at trial. Id. at 418-24. Craig did not pursue further review of this decision to the Ohio Supreme Court.

5

IV.     **Federal Habeas Petition**

On April 26, 2016, through counsel, Craig presented his habeas corpus petition to this court raising the following three grounds for relief:

> **GROUND ONE:** The Petitioner received ineffective assistance of trial counsel in violation of his constitutional rights pursuant the Sixth and Fourteenth Amendments to the Constitution of the United States.
>
> **GROUND TWO:** The Petitioner's conviction for felonious assault and firearms specifications are not supported by sufficient evidence.
>
> **GROUND THREE:** The Petitioner's substantive and procedural due process rights, guaranteed by the Fourteenth Amendment to the United States Constitution, were denied by the imposition of the exact same sentence upon the Petitioner at the Petitioner's resentencing hearing, by a different judge than the Petitioner's trial judge, in deference to the original sentence imposed by Petitioner's trial judge, where the court of appeals had ordered a de novo resentencing.

ECF Doc. No. 1, Page ID# 37-40.

V.      **Analysis and Findings**

Respondent asserts that Craig's petition is time-barred by the Antiterrorism and Effective Death Penalty Act ("AEDPA") because it was filed more than two years after the expiration of the AEDPA statute of limitations. ECF Doc. No. 7, Page ID# 72-73. Craig does not deny that his petition was untimely filed. Rather, Craig asserts that his claim of actual innocence acts as a gateway to permit equitable tolling, which would allow this court to consider the merits of his constitutional claims. ECF Doc. No. 9, Page ID# 454-460.

   A.   **Statute of Limitations**

Under 28 U.S.C. § 2244(d)(1), as amended by § 101 of the AEDPA, a person in custody under a judgment of a state court must file an application for a writ of habeas corpus within one year from the latest of:

6

  (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

  (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

  (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

  (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Cases become final on direct review for purposes of §2244(d)(1)(A) when certiorari is denied or the time to file a certiorari petition expires. *Lawrence v. Florida,* 549 U.S. 327, 333 (2007) (*citing Clay v. United States*, 537 U.S. 522, 527–28, n.3 (2003)).  If certiorari is not sought, cases become final upon the disposition of the state appeals or the expiration of the time for seeking state appeals of the conviction and sentence. *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 459-60 (6th Cir. 2012) (*citing Gonzalez v. Thaler*, 132 S.Ct. 641 (2012) (judgment of conviction final at the expiration of time for pursuing direct review in the state court)).

  Craig filed a direct appeal from his 2009 conviction which was partially successful given that the appellate court remanded his case for resentencing. ECF Doc. No. 7-1, Page ID# 228-30.  A few months after his resentencing, the Ohio Court of Appeals granted Craig's Motion for Delayed Appeal.  Id. at 309-10. 330-39.  He then filed an Application for Reconsideration, which was denied by the appellate court.  Id. at 347.  Next, Craig filed a notice of appeal to the Ohio Supreme Court.  Id. at 348-370.  However, on October 10, 2012, the Ohio Supreme Court again declined to exercise jurisdiction.  Id. at 372.  Craig's conviction became final 90 days later, on January 8, 2013.  Thus, Craig's AEDPA one-year limitations period began running

7

January 9, 2013. Absent tolling, the statute of limitations expired on January 9, 2014.[3]  28 U.S.C. § 2244(d)(1). Craig did not file his federal habeas petition until April 26, 2016, more than two years after the statute of limitations expired. ECF Doc. No. 1, Page ID# 15. Craig admits that his petition was untimely but contends that he is entitled to equitable tolling based on his claim of actual innocence. ECF Doc. No. 9, Page ID# 455-60.

B.  **Actual Innocence**

The Supreme Court has held that a properly supported claim of actual innocence may provide an equitable exception to overcome the AEDPA statute of limitations.[4] *McQuiggin v. Perkins*, ___U.S.___, 133 S. Ct. 1924, 1928, 185 L. Ed. 2d 1019 (2013); *Schlup v. Delo*, 513 U.S. 298, 316 [115 S.Ct. 851, 130 L.Ed.2d 808] (1995). However, the Sixth Circuit has "repeatedly cautioned that equitable tolling relief should only be granted sparingly." *Cook v. Stegall,* 295 F.3d 517, 521 (6th Cir.2002). Furthermore "actual innocence means factual innocence, not mere legal insufficiency.' " *Souter v. Jones*, 395 F.3d 577, 590 (6th Cir. 2005) (quoting *Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998)). And "[t]he petitioner bears the burden of demonstrating that he is entitled to equitable tolling." *McClendon v. Sherman,* 329 F.3d 490, 494 (6th Cir.2003). To support a colorable claim of actual innocence the petitioner must come forward with "new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." Schlup, 513 U.S. at 324, 115 S.Ct. 851. The petitioner must establish that "it was more likely than not that no reasonable juror would have convicted him in light of the new evidence." Id. at 327.

---

[3] Craig's post-conviction motion did not toll the statute of limitations because his post-conviction motion concluded several months prior to the completion of his direct appeal.
[4] The AEDPA also provides grounds for statutory tolling. None is even arguably applicable here.

Craig's proffered evidence of actual innocence consists of the affidavits of five family members (his mother, a grandfather, an uncle, an aunt, and a cousin). The affidavits generally attest that Craig was living in New York between July 1st and November 29th.[5] ECF Doc. No. 7-1, Page ID# 377-82. These affidavits were notarized in either April or July 2011. Id. The five affidavits were originally presented to the trial court in August 2011 as a basis of Craig's Motion for Leave to File a Motion for a New Trial or, in the alternative, Petition for Post-Conviction Relief. ECF Doc. No. 7-1, Page ID# 373-82.

The trial court denied Craig's motion as untimely and, with respect to the affidavits, stated as follows:

> AND IN REVIEWING THE EXPECTED NATURE OF THE "NEW" EVIDENCE AS SET FORTH IN THE DEFENDANT'S BRIEF, THE COURT IS UTTERLY UNIMPRESSED. IT STRAINS CREDIBILITY TO THE BREAKING POINT TO BELIEVE THAT THE DEFENDANT IN THIS CASE WAS UNAVOIDABLY PREVENTED, AS REQUIRED BY [OHIO CRIM. R. 33(B)], FROM DISCOVERING THAT HE WAS NOT ONLY NOT PRESENT AT THE SCENE OF THE CRIME, BUT WAS NOT EVEN IN THE STATE OF OHIO, ON THE DATE THAT THE CRIMINAL ACTS FOR WHICH HE WAS FOUND GUILTY WERE COMMITTED. FURTHER THE RECORD ITSELF REFLECTS THAT TESTIMONY WAS PRESENTED TO THE TRIERS OF FACT THAT THE DEFENDANT WAS NOT PRESENT AT THE TIME. THE COURT IS SIMILARLY UNIMPRESSED WITH THE SELF-SERVING, FORMULAIC AFFIDAVITS SUBMITTED UNDER PENALTY OF PERJURY BY THE DEFENDANT'S OWN FAMILY MEMBERS.

The appellate court affirmed the trial court's determination. The court of appeals also found that the affidavits were not entirely reliable because they were all from family members "interested in the success" of Craig's motion and that the affidavits did little to support Craig's claim that he

---

[5] Craig's mother's affidavit states that Craig was in New York from the end of June through November 2008. ECF Doc. No. 7-1, Page ID# 377-78. The affidavits from Craig's grandfather, cousin, and aunt all state that Craig was in New York from July 1 to November 29th, although they do not specify what year. Id. at 379, 381-82. The affidavit from Craig's uncle states that he was in New York City from July to November 29th but did not specify what year. Id. at 380.

was not responsible for the August 6, 2008 crimes. ECF Doc. No. 7-1, Page ID# 389. As the appellate court noted, "all but one of the affidavits base this claim on the fact that they observed Defendant at a family event." Id. However, none of the affidavits specifically mention August 6, 2008 or explain Craig's whereabouts on that particular date.[6] The affidavit of Ira Williams,[7] Craig's uncle, comes closest to addressing that date when it asserts: "[W]e ate dinner together each night." ECF Doc. No. 7-1, Page ID# 380. The appellate court pointed out that Craig had not shown that he was "unavoidably prevented from obtaining this information" prior to trial. Id. at 389. Finally, the appellate court found that the "new evidence" was merely cumulative to what was presented at trial.

The actual innocence standard requires new reliable evidence which establishes that it is "more likely than not that no reasonable juror would have convicted petitioner in light of the new evidence." Craig's evidence fails to satisfy this standard. The affidavits do not exculpate him. Furthermore, the evidence is neither new nor reliable.

Even if believed, the five affidavits do not establish an alibi for Craig on August 6, 2008; none speaks specifically to Craig's whereabouts on the date of the crime. The affidavits state generally that Craig was in New York from around July through November.[8] Only the affidavit of Ira Williams, if believed, can be argued to provide an account of Craig's whereabouts on

---

[6] Craig's mother attests that Craig attended birthday parties the last week of July and the first week of August but does not identify what dates the birthday parties took place on. ECF Doc. No. 7-1, Page ID# 377.

[7] The full name of Craig's uncle is difficult to discern from the handwritten affidavit. It appears to the undersigned that the name is Ira Williams and he will be referred to as such for the remainder of the opinion.

[8] As previously noted, Craig's mother's affidavit states that Craig arrived in New York at the end of June 2008. Three of the affidavits state that Craig arrived in New York on July 1st. And one of the affidavits states that Craig arrived in July.

10

August 6. Notably, only the affidavit from Craig's mother specifies the year in which Craig was living in New York as 2008. The other four affidavits do not specify a year at all.

Even if we infer that the other four affidavits refer to 2008, they still do not exculpate Craig. Although all of the affiants state that Craig was in New York between July and November, only Ira Williams says that he was with Craig every day. Most state that they saw him at a family get together.[9] None of the affiants specifically states that he or she was with Craig on August 6, 2008 or recites where they were on that date. Even his mother stated that Craig was with her "most" of the time, and she never mentioned August 6, 2008. Id. at Page ID#377. It is certainly possible that Craig could have been in New York before and after the date of the commission of the crime but away from New York on August 6, 2008. Nothing in the affidavits actually establishes that Craig was at a specific place in New York on the date in question. Thus, even if the affidavits are believed, they do not establish actual innocence, the generic reference by Ira Williams to eating together "each night" notwithstanding. *See e.g. Williams v. Tilton*, No. CV 11-3446-ODW MAN, 2012 WL 5289928, at *10 (C.D. Cal. Sept. 12, 2012), *report and recommendation adopted*, No. CV 11-3446-ODW MAN, 2012 WL 5289923 (C.D. Cal. Oct. 25, 2012) (finding that petitioner's sisters' claims to have seen him in Boston during the period from April through September did not establish that petitioner was in Boston on the July date in question).

But even if we were to credit the statement of Ira Williams and also conclude that the affidavits provided an alibi for the July 1 to November 29 period, Craig still does not meet the actual innocence standard, because the affidavits provide nothing new. They are merely

---

[9] Several of the affidavits referred to these occasions as "the family get together." And most recited that Craig was in New York from "July 1 to November 29." The similarity of expression in the affidavits goes to the weight they should be given.

11

cumulative to the evidence presented at trial.[10] Craig's grandmother, Cherrie Gilyard, testified at trial that Craig was in New York from July 14, 2008, until the end of November 2008. ECF Doc. No. 7-1, Page ID# 423. Similarly, the affidavits state that Craig was staying with his grandmother around the same time period. Id. at 377-82. *Souter*, 395 F.3d at 595 (evidence that is merely cumulative of the testimony presented at trial was not "new" evidence); *See also Allen v. Harry*, 497 F. App'x 473, 480 (6th Cir. 2012) (finding that affidavits that petitioner was outside at the time of the shooting were cumulative to the trial testimony).

Moreover, I find that the affidavits are not reliable. A reasonable juror could disregard the affidavits because they are from Craig's family members, people who have a personal stake in his exoneration, just as the trial jury implicitly rejected the alibi testimony of Cherrie Gilyard. Courts have consistently held that alibi affidavits from family members do not provide the sort of extraordinary showing needed to establish a petitioner's actual innocence. *See Freeman v. Trombley*, 483 Fed.Appx. 51, 60 (6th Cir. 2012) (finding that the credibility of the petitioner's ex-girlfriend and mother of his child were "suspect" and holding that an alibi affidavit submitted years after the petitioner's trial was insufficient to establish a credible actual-innocence claim); *Chavis-Tucker v. Hudson*, 348 F. App'x 125, 134 (6th Cir. 2009) (finding that affidavits of petitioner's wife and mother were unlikely to convince a reasonable jury that more likely than

---

[10] The Sixth Circuit has recognized that the circuits are split on whether the "new evidence" required under *Schlup* includes only newly-discovered evidence that was not available at trial, or encompasses any evidence not presented during trial. *Cleveland v. Bradshaw*, 693 F.3d 626, 633 (6th Cir.2012). In *Bradshaw*, the Sixth Circuit noted its decision in *Souter v. Jones*, 395 F.3d 577 (6th Cir.2005) suggested "newly presented evidence" is sufficient, but declined to resolve the issue whether "the 'new' evidence required under *Schlup* includes only newly discovered evidence that was not available at the time of trial, or broadly encompasses all evidence that was not presented to the fact-finder during trial, i.e., newly presented evidence." *Bradshaw*, 693 F.3d at 633. Thus, for purposes of this motion I am assuming, but not deciding, that the evidence may be considered "new" because it is "newly presented" even though not "newly discovered." This issue, however, is not determinative because the undersigned finds that the evidence is not new for another reason (i.e., because it is merely cumulative).

not that petitioner was actually innocent); *see also House v. Bell,* 547 U.S. 518, 552, 126 S. Ct. 2064, 2085, 165 L. Ed. 2d 1 (2006) (stating evidence from eyewitnesses with "no evident motive to lie…has more probative value than...[from] friends or relations of the accused."); *Wiles v. Warden, Marion Corr. Inst.,* No. 1:14CV685, 2015 WL 4467766, at *7 (S.D. Ohio July 21, 2015)(concluding that statements from petitioner's mother and interested family fell "far short" of establishing actual innocence); *Kalak v. Berghuis*, No. 2:11cv12476, 2015 WL 2169785, at *8 (E.D.Mich. May 8, 2015) ("Affidavits from family members that are created after trial are not sufficiently reliable evidence to support a finding of actual innocence.").

The discrepancies between the affidavits and Cherrie Gilyard's trial testimony also hint at their unreliability. Notably, all five affiants stated that Craig was in New York by July 1, 2008. ECF Doc. No. 7-1, Page ID# 377-82. Craig's mother, Joann Craig, put it even earlier, stating that Craig "was living in New York from the end of June 2008." Id., Page ID# 377. And she stated he attended a Father's Day cook-out. Id. She and Ira Williams both stated that Craig attended a July 4 cook-out. Id., Page ID# 377, 380. However, this evidence conflicts with his grandmother's trial testimony. Cherrie Gilyard testified that Craig was in New York beginning on July 14, 2008. Id., Page ID# 423.

I find that the five affidavits are neither new nor reliable. Craig's claims of actual innocence are also contradicted by the testimony of the four victims who identified Craig as the perpetrator of the crime. Craig argues that the victims' identification testimony was suspect because it was based on inherently unreliable voice identification. But he does not dispute the assertion of all four victims that they knew Craig personally. And each "testified that Craig was the intruder carrying the gun. They were able to each separately pick him out of the photo line-up and identify him in court. [One of the victims] also testified that he recognized Craig's face,

13

even though it was partially covered." ECF Doc. No. 7-1, Page ID# 223. The jury chose to believe the testimony of the four victims over the alibi testimony of Craig's grandmother. As a result, I cannot find that it is "more likely than not that no reasonable juror would have convicted [Craig] in light of" the newly presented affidavits from family members. *See Allen v. Harry*, 497 F. App'x 473, 480 (6th Cir. 2012) (finding the actual innocence standard was not met despite affidavits specifying that the petitioner was elsewhere at the time of the shooting when that evidence was considered alongside the trial testimony of eyewitnesses). For all of these reasons, the five affidavits of Craig's family members fall far short of the extraordinary showing needed to establish actual innocence.

Finally, Craig's reliance on *Cleveland v. Bradshaw* to support his actual innocence claim falls short. *Cleveland v. Bradshaw*, 693 F.3d. 626 (6th Cir. 2012). In *Cleveland*, the Sixth Circuit remanded a decision based on "four pieces of new evidence" presented by Cleveland that the Sixth Circuit found "to be sufficiently reliable to warrant equitable tolling for actual innocence." *Cleveland v. Bradshaw*, 65 F.Supp.3d 499, 509 (N.D. Ohio 2014). The "new" evidence consisted of (1) the sole eye-witness' alleged recantation; (2) flight records purporting to challenge the state's position regarding Cleveland's ability to travel from New York; (3) an affidavit purporting to reveal the unreliability of DNA evidence regarding the timeline of the murder, and (4) an alibi affidavit of a supposedly unbiased individual- Mr. Donaphin *Cleveland*, 693 F.3d at 635-36. In *Cleveland*, the purported alibi affidavit was not the only piece of evidence that supported remand, as would be the case here. Rather, the additional key pieces of evidence were the alleged recantation of the sole eyewitness, new and reliable forensic evidence, and flight information undercutting the state's timeline for the murder. Significantly, the Sixth Circuit's preliminary determination that the Donaphin affidavit was reliable was based on the

14

erroneous belief that the affiant was an impartial witness. However, upon presentation of the evidence on remand, the district court found that the affidavit was *not* reliable because Donaphin acknowledged he was a friend of and had regular contact with petitioner. *Cleveland*, 65 F.Supp.2d at 539. Ultimately the district court rejected Cleveland's arguments on remand and the Sixth Circuit declined to issue a Certificate of Appealability. *Cleveland v. Bradshaw*, Case No. 15-3029. Thus, *Cleveland* actually supports respondent's argument that Craig's affidavits are not reliable.

## VI. Conclusion

Because Craig has not established that a fundamental miscarriage of justice has occurred sufficient to overcome his statute of limitations violation, I conclude that the court cannot consider Craig's claims on the merits. I recommend that respondent's motion to dismiss be **GRANTED**.

## VII. Recommendation Regarding Certificate of Appealability

### A. Legal Standard

As amended by the AEDPA, 28 U.S.C. § 2253(c)(1) provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could

15

resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further.'"'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996)(quoting *Barefoot v. Estelle*, 463 U.S. 880, 893, n. 4 (1983)); *accord Slack v. McDaniel*, 529 U.S. 473, 483-484 (2000). The statute requires that certificates of appealability specify which issues are appealable. 28 U.S.C. § 2253(c)(3).

Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks the requirement of § 2253(c)(3) that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a). In light of the Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, a recommendation regarding the certificate of appealability issue is included here.

   B. Analysis

When a petition is to be dismissed on a procedural basis, the inquiry under § 2253(c) is two-fold. In such cases, a certificate of appealability "should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 485 (emphasis added). As the Court explained, "[w]here a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district

16

court erred in dismissing the petition or that the petitioner should be allowed to proceed further. In such a circumstance, no appeal would be warranted." *Id*. at 486.

If the court accepts the foregoing recommendations, Craig cannot show that the Court's ruling on his actual innocence claim is debatable. Thus, I recommend that a certificate of appealability not be issued in this case.

Dated: June 21, 2017

Thomas M. Parker
United States Magistrate Judge

### VIII. Notice to Parties Regarding Objections

Local Rule 73.2 of this court provides:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections that raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).